## State of Vermont v. Gardner Carpenter

[580 A.2d 497]

No. 89-221

Present: Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.

Opinion Filed August 10, 1990

*Jane Woodruff,* Orleans County State's Attorney, Newport, and *Pamela Hall Johnson* and *Gary S. Kessler,* Department of State's Attorneys, Montpelier, for Plaintiff-Appellee.

*Martin & Paolini,* Barre, for Defendant-Appellant.

**Gibson, J.** Defendant appeals from a conviction for aggravated assault on grounds that the State did not prove the element of a substantial risk of death and that the conviction was inconsistent with his acquittal on charges of sexual assault. We affirm.

Defendant was charged with sexually assaulting his 15-year-old adopted stepdaughter (13 V.S.A. § 3252(3)) and with causing her serious bodily harm (13 V.S.A. § 1024(a)(1)). The State based both charges on related events in February of 1988, when defendant picked the daughter up at his sister's house after

school. After stopping to buy groceries and wine coolers, he drove with the daughter to his own residence, which consisted of a trailer and a barn. The girl drank some of the wine cooler, but was uncertain as to how much she drank and whether defendant pressured her to do so. Though the original plan had been for the daughter to return to defendant's sister's home to sleep, she and defendant remained at defendant's residence, and the daughter went to bed there after she and defendant watched some videotapes. Since she had not brought her pajamas, she got into bed with her clothes on. Defendant thereafter came into her room to sleep with her, stating that the trailer's living room was cold. She then left the bedroom and went back to the living room. In a few minutes, defendant went to the barn, and when he requested help with the animals, she accompanied him. The alleged sexual assault took place in the barn, and subsequently, in the trailer. The juvenile testified that following the sexual assault, defendant continued with a physical assault in order to frighten her into silence about the sexual assault. It is that conduct that provided the basis for the aggravated assault charge.

At the close of the State's case, defendant filed an acquittal motion to the aggravated assault charge, arguing that the State had failed to show that defendant had caused a "substantial risk of death" within the meaning of 13 V.S.A. § 1021(2).* In denying the motion, the trial court found that, taking the evidence in the light most favorable to the State and excluding modifying evidence, the evidence at trial showed:

> 1. The defendant forced the victim's head into a bucket of water three times in rapid succession. The victim was unable to breathe while her head was emersed [sic].

---

* Under 13 V.S.A. § 1024(a)(1), a person is guilty of aggravated assault if he "causes [serious bodily] injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." "Serious bodily injury" in turn is defined in 13 V.S.A. § 1021(2) as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

2. When the victim was able to knock the bucket over, the defendant immediately placed his hands on her neck and began choking her.

3. While the choking progressed, the victim lost consciousness for an indeterminate period of time, regained consciousness briefly, then lost consciousness again for an indeterminate period. She was unable to breathe while being choked.

4. Upon regaining consciousness the second time, she found herself vomiting blood into a sink.

5. The choking caused a contusion on her neck.

6. The choking caused petechiae (red, freckle-like marks) to form on her face. These petechiae are formed when tiny blood vessels rupture as a result of an impedence [sic] of the outflow of blood from the brain. According to Dr. Peck, these marks were located all over her face, and were "prominent" and "remarkable."

7. The choking also cause[d] hemorrhaging of the tiny blood vessels in her eyes. This hemorrhaging was also "prominent."

8. Dr. Peck, while not an expert of choking, testified from his general medical knowledge that lapsing into unconsciousness from choking results from a depletion of oxygen to the brain, and that oxygen depletion can eventually result in death.

The jury found defendant innocent of the charge of sexual assault but guilty of aggravated assault. The present appeal followed.

■ ■ Defendant argues first that the State failed to prove that he had caused a bodily injury which created a substantial risk of death within the meaning of the statute and that the motion for acquittal should have been granted. In deciding such a motion, the court's inquiry must be whether the prosecution has introduced evidence "fairly and reasonably tending to show the defendant's guilt, that is, whether the jury on that evidence would be justified in finding guilt beyond a reasonable doubt." *State v. Chenette*, 151 Vt. 237, 241, 560 A.2d 365, 369 (1989). In

the instant case, the trial court carefully spelled out the evidence that met the standard, and the evidence was substantial. The testimony that defendant repeatedly forced the daughter's head into a bucket of water, that the child was unable to breathe, that defendant choked her, and that she lost consciousness and vomited blood was more than sufficient to withstand the dismissal motion. See *State v. Blakeney*, 137 Vt. 495, 500, 408 A.2d 636, 640 (1979) (choking of victim for three to four minutes presented jury question as to whether there had been a substantial risk of death).

 Defendant, like the defendant in *Blakeney*, argues that none of the effects of the choking amounted to serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ, within the meaning of the § 1021(2). But as we pointed out in *Blakeney*, permanent physical damage is not an essential element in proving a "substantial risk of death." *Id.* at 500, 408 A.2d at 639. An act can impair the function of a bodily member without threatening death, such as injuring a victim's eye. It is equally clear that an act can create a substantial risk of death without resulting in either death or permanent impairment, and choking is a good example of such act. Section 1021(2)'s definition of "serious bodily harm" is written in the disjunctive, allowing a jury to find such harm if it finds a "substantial risk of death *or . . .* serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." (Emphasis added.) The contention that both are required to constitute "serious bodily harm" is without merit.

 Defendant next argues that the "substantial risk of death" must be proven by a medical expert, and that the expert in the present case did not express a clear opinion as to the degree of the risk of death. As we stated in *State v. Sorrell*, 152 Vt. 543, 547, 568 A.2d 376, 378 (1989), it does not take a medical expert to prove that a victim is in substantial danger of death when a person is choked to the point of passing out. In the present case, a medical doctor testified that deprivation of oxygen can result in death. While there was no testimony as to the pre-

cise length of time that the daughter was unconscious, the testimony as to clinical conditions reflecting a loss of blood flow and oxygen provided a sufficient basis on which to differentiate the seriousness of the assault from an assault which could not reasonably be associated with the threat of death.

■■ Finally, defendant contends that his conviction on the aggravated assault count is logically inconsistent with his acquittal on the sexual assault charge and should be reversed. There was no inconsistency between the verdicts, however. The complaining witness testified that defendant sought to silence her about his previous conduct, which he had reason to believe might be deemed criminal conduct. His motivation to keep the witness silent existed, if at all, at the time of the occurrence of the events in question, not later when the jury determined that he was not guilty of sexual assault. The evidence was sufficient to show that his purpose in putting the daughter's head into a bucket of water and of choking her was to promote fear and prevent exposure of what he had good reason to believe might be a sexual offense. Acquittal on the sexual assault charge did not affect his motivation for the physical assault or detract from what the evidence fairly indicated was a specific intent to cause bodily harm. See *United States v. Martinez*, 775 F.2d 31, 36 (2d Cir. 1985) (proof of retaliatory motivation is not required to prove defendant's intent to kill victim). Moreover, logical consistency between verdicts is not a requirement of law, and allowing a verdict to stand that is inconsistent with the jury's determination on another count does not violate due process principles. *United States v. Powell*, 469 U.S. 57, 65 (1984); *Dunn v. United States*, 284 U.S. 390, 393 (1932).

*Affirmed.*